**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-cv-00238-RJC-DSC**

| | |
|---|---|
| **CHRIS SANDERS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | |
| ) | **ORDER** |
| **APEX TRANSIT LLC,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment. (DE 10). This matter has been fully briefed, and on November 22, 2021, the Court conducted a hearing where it heard oral arguments from the parties. The Court has reviewed the pleadings, filings, exhibits thereto, and applicable law and has considered the parties' briefed and oral arguments. For the reasons stated herein, Defendant's Motion for Summary Judgment is **GRANTED**.

**I.    BACKGROUND**

   **A.    Factual Background**

Plaintiff Chris Sanders ("Sanders") was employed by Defendant Apex Transit LLC ("Apex") as a commercial truck driver. The employment relationship began in July 2017 and lasted approximately fifteen months. (DE 1 at ¶1; DE 10-3 at 17:21–24). As required by the Federal Motor Carrier Safety Administration ("FMCSA"), Sanders underwent a Department of Transportation ("DOT") medical examination and received a DOT medical certificate showing he was fit to drive commercial trucks in September 2017. (DE 10-2 at 36:3–8). The DOT medical certificate was valid for two years, which included the entirety of his employment with Apex. (DE

12 at 2). During his employment, Sanders drove a route between Charlotte, NC and Laredo, Texas, making approximately 60 trips. (DE 12 at 2).

Sanders drove for Apex without incident until suffering from four episodes of dizziness and blurred vision. (DE 10-2 at 18:4–10). During each of the four episodes, Sanders admits that he was unable to operate the truck. (*Id.* at 25:18–22). The first instance occurred near Laredo, Texas. Sanders "got really dizzy and everything got blurry" and he was unable to make a pick-up, so Apex sent another driver to complete the job. (*Id.* at 18:16–19:22). Two or three weeks later, Sanders got dizzy again while he was driving on the interstate through Alabama and had to pull over. After resting for a couple hours, Sanders continued on and completed delivery of the load. (*Id.* at 20:13–21:21). Sanders then had a third episode driving back from Texas to Charlotte that required him to again pull off the road and rest before continuing on. (*Id.* at 24:20–25:17). On or around October 8, 2018, Sanders had his fourth episode of dizziness and blurred vision while driving. Sanders had to alert dispatch that he was unable to drive and complete the load, and Apex sent another driver to relieve Sanders. (*Id.* at 21:22–23:11; DE 10-5 at ¶¶2–4; DE 1 at ¶25). While the exact timing of the first three instances is not precisely known, they occurred during the final months of Sanders' employment with Apex.

After the fourth episode, when Sanders returned to the warehouse in Charlotte, the President of Apex, Stan Ivanov ("Stan"), told Sanders that he was probably a diabetic. Sanders responded that he was not diabetic. At a doctor's appointment the next day, Sanders was diagnosed with diabetes. (DE 10-2 at 23:24–24:8). Sanders' condition did not require treatment with insulin, and his doctor prescribed Metformin.[1] (DE 12 at 4). Shortly after being diagnosed with diabetes,

---

[1] Since starting Metformin, Sanders has had no further episodes of dizziness and blurred vision. (DE 12 at 10).

Sanders returned to Apex and requested, and was given, a load to haul to Laredo. (*Id.* at 26:17–27:22). This trip lasted from October 24, 2018 to October 29, 2018. (DE 10-10). During this trip, while returning to Apex, Sanders called Stan and informed him of his diabetes diagnosis. (DE 10-2 at 25:23–26:7; DE 10-4 at 11:17–12:13). Stan told Sanders that they would discuss it further when Sanders returned. When Sanders returned to the warehouse on October 29, 2018, Stan and Marina Ivanov ("Marina"), the head of HR at Apex, had a conversation with Sanders. The parties dispute what was said.

Apex alleges that Stan told Sanders he would need to meet with Apex's HR department to see what must be done to ensure compliance with FMCSA regulations for diabetes. (DE 10-1 at 4). That same day Sanders then met with Marina who informed Sanders that he would need a new DOT medical examination performed to continue driving with Apex and requested that Sanders complete FMCSA forms regarding diabetes. The forms required the applicant to be examined by a DOT approved medical examiner. (DE-9). During the meeting with Marina, Sanders asked for his bond back from Apex, which Marina believed was to cover the expenses of his medical examination and the time Sanders would not be able to drive. (DE 10-1 at 4). As Apex owns each truck, Apex holds a security bond from each driver that is normally returned when the employment contract is terminated by Apex or the driver. (DE 10-1 at 6).

Sanders' version of events differs. Sanders alleges that Stan told him that "I have to fire you because you are diabetic." (DE 1 at ¶27). Sanders also asserts that he was never informed that he needed to go to a DOT medical examiner and get a new DOT medical examination. Sanders admits he was given FMCSA forms regarding diabetes for his doctor to fill out and that he

3

requested and received his bond from Apex. From October 29, 2018[2] onwards, Sanders alleges he was under the impression he was fired and that no one at Apex ever specifically told him he needed a new medical exam.

It is undisputed that Sanders did not complete a new DOT medical examination. Instead, on November 7, 2019, Sanders had his non-DOT-certified doctor, the same doctor that treated and diagnosed Sanders with diabetes, fax a note to Apex that "Mr. Christopher Sanders is currently under my care and has Diabetes Mellitus Type 2 and is not on insulin." (DE 10-8). After Sanders reached out to Marina to see if Apex had received the doctor's note, Marina told Sanders she had received the note but that it was insufficient pursuant to FMCSA regulations and that Sanders would need a new DOT medical certificate. Sanders then met in person with Marina on November 12, 2018 to pick up his bond check. During the meeting, Marina reiterated her request for a new DOT medical certificate. (DE 10-1 at 5).

This was the last communication Sanders had with Stan or Marina. Sanders admits that he never asked for any type of reasonable accommodation, but states that he did not know he had the right to ask for one. (DE 12 at 6; DE 10-11 at 3; DE 10-2 at 19).

**B.  Procedural Background**

On approximately March 21, 2019, Sanders filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that Apex failed to accommodate his disability and that he was fired because he was a diabetic in violation of the Americans with Disabilities Act ("ADA"). After an unsuccessful conciliation process between the parties, the EEOC issued a Notice of Right to Sue on January 24, 2020.

---

[2] The complaint erroneously asserts that Sanders was fired on October 22, 2018, before the meeting with Stan. (DE 1 at ¶27). Plaintiff admits in his Response to Defendant's Motion for Summary Judgment this was an error and the correct date is October 29, 2018. (DE 12 at 20).

4

On April 21, 2020, Plaintiff filed a Complaint asserting two causes of action: (1) violation of the ADA and (2) wrongful discharge in violation of North Carolina public policy under N.C. Gen. Stat. § 143-422.2.[3] (DE 1). Defendant filed its Answer on July 31, 2020, and the parties then completed discovery. Defendant then timely filed the instant motion for summary judgment on all issues on July 9, 2021.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. *Id.* The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."

---

[3] This statute prohibits employers from discriminating based on a disability.

*Anderson*, 477 U.S. at 248; *accord Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249–50.

## III. DISCUSSION

### A. Qualified Individual[4]

For Sanders to succeed on his disability discrimination claim he must be a qualified individual. The ADA prohibits employers from discriminating based on the known physical or mental impairments of a "qualified individual with a disability." 42 U.S.C. § 12101 *et seq.* Such unlawful discrimination can include the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . ." *Id.* § 12112(b)(5)(A); *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013). To state an ADA discrimination claim, a plaintiff must show that he (1) was a qualified individual with a disability; (2) was discharged; (3) was fulfilling the legitimate expectation of the employer; and (4) the circumstances of the discharge raise a reasonable inference of unlawful discrimination. *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th

---

[4] For purposes of this Order, the Court assumes without deciding that Sanders was fired and declines to opine on whether Sanders' uncorroborated allegations surrounding his unilaterally alleged firing are sufficient to trigger a jury trial on the termination issue based on disputed facts.

6

Cir. 2012). "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Here, Sanders worked as a commercial truck driver for Apex. For Sanders to be a qualified individual under the ADA, he must meet minimum safety standards as defined by the FMCSA for commercial drivers. *See* 49 C.F.R. § 391.1. The obligations imposed by these standards apply both to Sanders, as a driver, and Apex, as a motor carrier. Specifically, motor carriers cannot "require or permit a person to drive a commercial motor vehicle unless that person is qualified to drive a commercial motor vehicle," and drivers "shall not drive a commercial motor vehicle unless he/she is qualified to drive a commercial motor vehicle." 49 C.F.R. § 391.11. To qualify as a commercial driver, individuals must pass a DOT medical examination every two years to maintain their Commercial Driver's License ("CDL"). 49 C.F.R. § 391.43, 45(b). However, a driver with a current DOT medical examination is required to obtain a new examination if that "driver['s] . . . ability to perform his or her normal duties has been impaired by a physical or mental injury or disease." 49 C.F.R. § 391.45(f). While "physical or mental injury or disease" is undefined in the regulations, the Regulatory Guidance for the Federal Motor Carrier Safety Regulations states that a driver returning from illness is required to obtain a new medical certification when the "injury or illness has impaired the driver's ability to perform his/her normal duties." *Perry v. Dillon's Bus Serv.*, No. ELH-16-3207, 2017 U.S. Dist. LEXIS 89466, at *15–16 (D. Md. June 9, 2017).

In support of its summary judgment motion, Apex argues that Sanders was not qualified to operate commercial vehicles after the episodes of dizziness and blurred vision until he was medically examined and re-qualified to drive by a DOT medical examiner, and that the November 7, 2018 medical note was irrelevant as it was issued by a non-DOT medical examiner.

7

In response, Sanders argues that it is a disputed fact as to whether Sanders was required to submit a new medical examination because his overall ability to perform his normal duties was not impaired by any physical or mental injury or disease, as the dizziness and blurred vision were isolated events that could have been caused by "tiredness, hunger, stress, flue, etc." (DE 12 at 12). Sanders also notes that he has had no more episodes of dizziness or blurred vision after starting medication for diabetes and asserts that it is for the jury to decide whether the events were isolated occurrences or whether additional medical examination was required.

The law is clear that a commercial driver who has an illness or injury that impairs his ability to drive is required to obtain a new DOT medical examination of fitness, regardless of whether his current DOT medical examination is still valid and regardless of whether his current employer requests a new medical examination. The law also does not differentiate between an isolated or more permanent condition. While "illness or injury" is not defined, case law is illuminative and shows that ailments which impair one's ability to safely operate a commercial vehicle suffice to trigger the new medical examination requirement.

In *Perry*, plaintiff was a commercial bus driver who suffered chest pains and numbness in his arm while driving his bus and was taken by ambulance to the emergency room. *Perry v. Dillon's Bus Serv.*, No. ELH-16-3207, 2017 U.S. Dist. LEXIS 89466, at *2–6 (D. Md. June 9, 2017). Plaintiff was released from the hospital the next day with a note that he was allowed to return to work. However, his employer prevented him from working for a month because of the incident. The Court found that plaintiff's symptoms impaired his ability to perform his normal duties, that his employer was under no obligation to rely on the medical note from a private physician, and that there was no ADA violation. *Id.* at 15–17, 25–26. In particular, the court found that the "ADA does not grant a CMV driver an automatic right to return to work immediately after

8

suffering symptoms suggestive of a heart attack or a cardiac event, merely because a doctor has said so. As noted, only certain health care providers may render such opinions." *Id.* at *25–26.

In *Tate*, the court found that a commercial trucking company was allowed to require its driver to obtain a new DOT medical examination after the driver suffered from a bout of schizophrenia and diabetes. *Tate v. NC Pepsi-Cola Bottling Co. of Charlotte, Inc.*, No. 3:09-cv-36, 2011 U.S. Dist. LEXIS 96896, *2–11 (W.D.N.C. Aug. 29, 2011). Similarly, in *Bay*, a commercial driver was required to obtain a new DOT medical examination after experiencing chest pains and dizziness while driving. *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 972, 975 (7th Cir. 2000) (noting that the employer "was not allowed to permit Bay to resume driving until he produced a copy of a doctor's certificate indicating he was physically qualified to drive"). While Bay did try, and fail, to receive a new DOT medical examination, the Court found that Bay's ADA claim was fatally flawed as Bay was not a qualified individual because his lack of a new DOT medical examination disqualified him from driving. *Id.* at 974.

Here, the undisputed facts show that Sanders suffered from episodes of dizziness and blurred vision on at least four separate occasions which so impaired Sanders that he was unable to operate his vehicle. At least two of these episodes occurred while Sanders was driving heavy machinery on public highways and required him to pull over to the side of the road. Sanders was also unable to complete the haul on multiple occasions because of these episodes. These are facts that Sanders himself admits and which are not disputed. These facts also parallel other cases which found that an employer is allowed to require a driver to acquire a new DOT medical examination when the driver suffers from an ailment like dizziness, which impairs the safety of not only the driver but all those on public roadways. And, as Sanders did not have a new DOT medical examination approving his fitness to drive at the time he was allegedly fired, he was unqualified

9

under the FMCSA, and, accordingly, was not a qualified individual under the ADA. Sanders' medical note does nothing to change this calculus as "a letter from a physician opining that plaintiff should be recertified does not constitute DOT medical certification." *Tate*, 2011 U.S. Dist. LEXIS 96896, at *9.

Plaintiff's argument that summary judgment is not appropriate on this issue because it is a disputed fact whether Sanders was required to obtain a new DOT medical examination is unavailing. There are no disputed facts at issue here. Instead, Plaintiff attempts to disguise his legal argument on whether FMCSA regulation 49 C.F.R. § 391.45(f) was triggered as a manufactured factual disagreement. However, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And this type of purely legal question over whether a regulation was triggered based on undisputed facts is ripe for summary judgment.

Plaintiff further argues that summary judgment is not appropriate because Defendant failed to address Sanders' claim of disability discrimination based on a perceived disability. (DE 12 at 7). In particular, Plaintiff contends that a factfinder could determine Sanders was not disabled but that Apex perceived him as disabled. This is irrelevant because, regardless of whether Sanders was disabled or perceived as disabled, he still must have been a qualified individual under the ADA. 42 U.S.C. § 12111(8); *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012); *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702–03 (4th Cir. 2001).

### B. Reasonable Accommodation

As another independent ground for summary judgment, Apex argues that Sanders never requested a reasonable accommodation. In response, Sanders argues that under the ADA an employee is not required to specifically ask for a reasonable accommodation.

"For a plaintiff to establish a prima facie case against his employer for failure to

accommodate under the ADA, the plaintiff must show: (1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (citing *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)) (internal quotations omitted).

In the Fourth Circuit, employees have an obligation to inform employers about the need for an accommodation. However, the burden to provide notice of a disability under the ADA "is not a great one. . . . Adequate notice simply informs the employer of both the disability and the employee's need for the accommodations for that disability." *EEOC v. Federal Express Corp.*, 513 F.3d 360, 369 n.5 (4th Cir. 2008). An employee does not need to use the terms "ADA" or "reasonable accommodation" to provide notice of the need for an accommodation, *Id.* at 369, as there are no magic words needed to convey an accommodation request. *Sydnor v. Fairfax County*, No. 1:10-cv-934, 2011 U.S. Dist. LEXIS 22287, at *18 (E.D. Va. Mar. 3, 2011). However, some type of *de minimis* request, at a minimum, must be made. *See Parkinson v. Anne Arundel Med. Ctr.*, 79 Fed. Appx. 602, 604 (4th Cir. 2003) (To find a violation of the ADA for failure to accommodate, the "[employee] first must have, at minimum, communicated to [his employer] a wish for accommodation of his disability."); *see also Ballard v. Rubin*, 284 F.3d 957, 962 (8th Cir. 2002) ("[T]he notice nonetheless must make clear that the employee wants assistance for his or her disability. In other words, the employer must know of both the disability and the employee's desire for accommodations for that disability.").

Taking the evidence in a light most favorable to the non-moving party, Sanders informed Apex of his disability when he told Stan and Marina he was diabetic. However, Sanders admits,

11

and there are no facts which show, that Sanders made any type of affirmative request for an accommodation. While there are no magic words that are required, an employee must make some *de minimis* request. Sanders admitted failure to make such a request vitiates his disability claim.

### C. Interactive Process

Plaintiff claims that summary judgment is unwarranted because Defendant failed to address Sanders' claim of disability discrimination based on failure to engage in the interactive process in good faith. The duty to engage in the interactive process is explained by the Fourth Circuit in *Jacobs*.

> The ADA imposes upon employers a good-faith duty to engage with their employees in an interactive process to identify a reasonable accommodation. This duty is triggered when an employee communicates her disability and desire for an accommodation—even if the employee fails to identify a specific, reasonable accommodation. However, an employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position.

*Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 581 (4th Cir. 2015) (internal quotations and citations omitted).

As previously discussed, Sanders failed to request an accommodation. Accordingly, no duty to engage in an interactive process to identify a reasonable accommodation was triggered, and Plaintiff's interactive process argument fails.

### IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment, (DE 10), is **GRANTED**.

**SO ORDERED**.

The Clerk is directed to close this case.

Signed: December 30, 2021

Robert J. Conrad, Jr.
United States District Judge